UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-80064-CR-SMITH/MAYNARD

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

FRANK STANZIONE,

      Defendant.

_____/

## DEFENDANT'S MOTION TO DISMISS FOR SELECTIVE PROSECUTION

The Defendant, Frank Stanzione, through counsel, files this Motion to Dismiss for Selective Prosecution pursuant to Rule 12(b)(3)(A) of the Federal Rules of Criminal procedure, in this case.[1] In support thereof, the Defendant states the following:

"The judiciary cannot interfere with a prosecutor's exercise of charging discretion, **except in narrow circumstances where it is necessary to do so in order to discharge the judicial function of interpreting and applying the**

---

[1] Local Rule 7.1(c)(1) limits the number of pages in motions to no more than 20-pages. SDFL Local Rule 7.1(c)(1). This motion under Rule 12(b)(3)(A) of the Federal Rules of Criminal procedure, which shifts the burden of proof (for such motion) to the Defendant to show that other persons have not been prosecuted for similar conduct, mandates that the Defendant present to the Court evidence of **all other** prosecutions. To do so requires a voluminous review of other cases and crime data. This burden necessitates more than 20-pages to make the required showing.

**Constitution**. *United States v. Smith,* 231 F.3d 800, 807 (11th Cir. 2000) (emphasis added). Prosecutions are limited by certain "constitutional constraints, including those 'imposed by the equal protection component of the Due Process Clause of the Fifth Amendment.'... Under that clause, 'the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Smith,* 231 F.3d at 807 (internal citations omitted). In cases where a defendant maintains that a prosecutor "has brought the charge for reasons forbidden by the Constitution," the defendant may raise a claim of selective prosecution. *Id.* (internal citations omitted).

The Defendant alleges that his prosecution in this case for allegedly violating 18 U.S.C. § 875(c), is based upon his exercise of political speech related to gay-rights, and is retaliatory and vindictive. *See Hartman v. Moore,* 547 U.S. 250, 256 (2006) ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out[.]"). The Defendant maintains that he exercised a fundamental constitutional right in his political speech towards United States Congressman George Santos. As will be shown herein, at the time of the voicemail that was left in this case, Congressman Santos ("Santos") had engaged in several political acts considered by gay-rights activists to be "anti-gay," and which caused angry political backlash from members (such as the Defendant) in the gay-rights community. The Defendant's speech in this case was related to, and a voicing of protest related to those acts.

To meet his burden to prove that this prosecution is impermissibly selective, as alleged in this motion, the Defendant must show two things: **(i) Others who have committed the same alleged acts have not been prosecuted for those acts; and (ii) That the Defendant was prosecuted in this matter predicated on a constitutionally inappropriate motivation (such as the exercise of a constitutionally protected right).** *See United States v. Gordon,* 817 F.2d 1538 (11th Cir. 1987) (emphasis added).

### I) <u>*THE ALLEGED OFFENSE CONDUCT:*</u>

It is alleged in the indictment that on January 29, 2023, at 12:24 a.m., the following voice message was left on the office "main line" for Congressman George Santos:

> George Santos you fat fucking piece of shit faggot. You better watch your mother fucking back because I'm gonna bash your mother fucking faggot head in with a bat until your brains are splattered across the fucking wall. You lying, disgusting, disgraceful, motherfucking faggot. You mother fucking piece of shit. You're gonna get fucking murdered you goddamn lying piece of garbage. Watch your back you fat, ugly, piece of shit. You and your husband are dead.

The following morning at 09:36 hours, the United States Capitol Police ("USCP") Threat Assessment Section ("TAS") received a report from Santos' Congressional Office reporting the above voice message. Investigation revealed that the call and message were made from a phone number associated with the Defendant, using a cellular phone tower in Boynton Beach, Florida, in the Southern District of

Florida (where the Defendant was located). The Defendant was arrested without incident, was cooperative, and admitted to making the phone call above, and apologized for doing so. The Defendant indicated that his reason for making the call was to "let him know what a piece of shit he was" and to "make him feel like a piece of shit." The Defendant stated that he feels offended by Santos and does not want him "in his (gay) community." The Defendant is a long-standing, active advocate for gay rights. The Defendant was indicted for violating 18 U.S.C. § 875(c), a felony offense with a maximum possible penalty of five (5) years of imprisonment.

II)   ***OTHERS WHO HAVE COMMITTED SIMILAR ALLEGED ACTS HAVE NOT BEEN PROSECUTED FOR THOSE ACTS:***

1) ***The prosecution of communications directed at public officials is exceptionally rare and politically "selective:"***

There is no identifiable source to obtain the number of federal prosecutions under 18 U.S.C. § 875(c) for threats to members of Congress. There *is* readily available data to determine that there are virtually no federal prosecutions for similar, reported alleged threats to members of Congress, to wit: U.S. Capitol Police ("USCP") statistics. The Defendant's case was reported by Santos' office to USCP, and handled by that Department's Threats section ("TAS").

According to the USCP TAS website press release on January 17, 2023, TAS investigated 7,501 threats against members of Congress in 2022. https://www.uscp.gov/media-center/press-releases/uscp-threat-assessment-cases-2022 (last accessed June 29, 2023). The Capitol police website includes records for the

last two-years, and includes two "threat" incidents which reveal how these cases

commence. These reports look like this:

> 5/8/23 Threats to do bodily harm- misd. 230508001013 R/O
> responded to a House Office Building for a report of an individual
> making threats via phone. The Complainant stated the Suspect
> has been calling over the past couple of months making
> threatening comments. An email was sent to the Threats Section
> (TAS) of USCP by the Complainant notifying them of the incident.
> TAS will continue to investigate.
> 9/2/22 Threats to do bodily harm- misd 220902001334 R/O
> responded for a report of staff in distress in the Longworth House
> Office Building. The Complainant advised that the Suspect had
> called the office multiple times, indicated they were outside the
> building, and had threatened to inject the Complainant with a
> lethal substance. While the R/O was present, the Suspect called
> again and advised they were outside the New Jersey Avenue and
> C Street, SE, door of the Longworth House Office Building. The
> Assisting Officer (A/O) approached the Suspect at New Jersey
> Avenue and C Street, SE, where the Suspect confirmed they
> threatened the Complainant. The Suspect was placed under
> arrest and transported to Headquarters for processing."

https://www.uscp.gov/daily-arrests (last accessed June 30, 2023).[2] This is how the

Defendant's case was initiated: with a call from Santos' office to TAS. According to

the USCP website, 7,501 of these calls were made to TAS from members of Congress

in 2022.[3] As such, it is easy to ascertain that in 2022, alleged threats similar to the

call in this case that resulted in Santos' office contacting TAS, occurred 7,501 times.

The next step in this analysis is determining how many of those 7,501 threats

(in 2022), or other years were actually *prosecuted* for a violation of 18 U.S.C. § 875(c),

---

[2] Notably, and inexplicably, USCP TAS treated both of these phone "threat" cases
as misdemeanors, "misd," including the second incident where the person making
threats was suddenly outside the building.

[3] No data is yet available for 2023.

as the Defendant is being prosecuted herein. This is far more difficult to determine. Nonetheless, it is clear that the overwhelming majority of these threat investigations did *not* result in prosecutions, and that the Defendant's prosecution for this conduct is *exceptionally and extremely* rare. This becomes clear when one reviews data available from the United States Sentencing Commission.

The Sentencing Guideline used for violations of 18 U.S.C. § 875(c) is U.S.S.G. § 2A6.1. Thus, one can reasonably ascertain how many prosecutions for violations of § 875(c) occurred nationally through 2021 (the last year this data was available).[4] Comparing the number of cases using U.S.S.G. § 2A6.1 with the number of cases USCP TAS investigated that same year yields important data for the *lack of prosecutions* based upon the threats received by members of Congress:

| Year | 2017 | 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|------|------|
| # of cases using §2A6.1 | 185 | 188 | 259 | 226 | 206 |
| # of TAS threats to Congress Investigations | 3939 | 5206 | 6955 | 8613 | 9625 |

https://www.ussc.gov/research/data-reports/guideline (No USSC data is yet available on the website for 2022) (last accessed June 29, 2023); https://www.uscp.gov/media-center/press-releases/uscp-threat-assessment-cases-2022 (last accessed June 29, 2023). However, this is not a direct data comparison, because, §2A6.1 is used for *all*

---

4 This Guideline can also be used in cases involving 18 U.S.C. § 115(a)(1)(B), though other Guidelines also cover that statute.

cases involving the interstate communication of threats, **whether to a member of congress or anyone else**, so it is impossible to determine from the data available how many cases using this Guideline involve communication to members of Congress. It is apparent that *even if all uses of §2A6.1 in 2021 were for threats to Congress,* this would mean only 2.14% of the "threats" TAS investigated were actually prosecuted. Yet, not all of the uses of §2A6.1 were for cases related to threats to members of Congress. Thus, it is clear that the number of prosecutions for threats to members of Congress was somewhere less than 2% of the actual reported "threats."

The Department of Justice appears to issue press releases when they arrest and prosecute threats to members of Congress. Searching these press releases by year reveals a tiny number of actual prosecutions for threats to member of Congress. There appear to be 8 such press releases in 2022. For instance, in 2022:

1)  In 2022, **David Hannon** was prosecuted in the Middle District of Florida for violating 18 U.S.C. § 115(a)(1)(B), for assault on a member of Congress, which carries a 1-year maximum possible penalty. Hannon pled guilty to sending an email to a member of Congress "threatening to kill her. ….In his threatening email, which had a subject line that read, '[You're] dead, you radical Muslim,' Hannon referred to Congresswoman Omar and the other Congresswomen of color as 'radical rats,' and asked Congresswoman Omar if she was prepared 'to die for Islam.' The email further stated that Hannon was going to shoot the Congresswomen in the head." https://www.justice.gov/usao-mdfl/pr/florida-man-pleads-guilty-federal-charges-hate-motivated-threats-against-us-member (last accessed June 29, 2023). But Hannon was *not charged* with violating 18 U.S.C. § 875(c). He was sentenced to a term of 36-months probation. 22-cr-00134-KKM-CPT-1 (MDFL) DE:37. (§ 115(a)(1)(B) case)(misdemeanor)

2)  In 2022, **Joshua Hall** was prosecuted in the Southern District of New York for violating 18 U.S.C. § 875(c). Hall placed a series of telephone calls to a member of Congress. "HALL conveyed threats to kill the Congressman to at least three different members of the Congressman's staff …. On a telephone call with Staff Member-1 and Staff Member-2, HALL stated, in substance and in part, that he had a lot of AR-15s; that he wanted to shoot the Congressman;

that he intended to come to the Congressman's office with firearms; and that if he saw the Congressman, he would kill him. He further stated, …and in part, that he wanted to 'beat the shit out of' the Congressman and that he would find the Congressman wherever he was and hurt him. On a telephone call with Staff Member-3, HALL stated, in substance and in part, that he intended to come to the Congressman's office to kill the Congressman with firearms." At the time he made the threats, Hall was on pre-trial release for another federal offense. https://www.justice.gov/usao-sdny/pr/pennsylvania-man-pleads-guilty-making-threats-kill-united-states-congressman (last accessed June 29, 2023). 21-cr-00605-GHW (SDNY). (multiple threats case)

3) In 2022, **Mark Leonetti** was charged with seven counts of violating 18 U.S.C. § 875(c) in the Western District of Washington. 23-cr-05001-DGE-1 (WDWA) DE:1. He is alleged to have left voicemails on seven occasions to multiple Congresspersons with a multitude of threats. The case remains set for trial. (multiple threats case)

4) In 2022, **Chase Neill** was charged in the District of Kansas with violating 18 U.S.C. § 115(a)(1)(B) for repeatedly threatening a U.S. congressman that he would kill him. Neill was convicted at trial. 22-cr-40037-HLT (DKS) DE:1. "Neill admitted in court that he left the June 5 voicemail and others with more death threats the next day." https://apnews.com/article/politics-albuquerque-kansas-topeka-prisons-bf01d9142e08750036a8eb1148de7b08 (last accessed June 29, 2023). (multiple threats and § 115(a)(1)(B) case)

5) In 2022, **Douglas Casey** was charged in the Eastern District of Texas with threatening a Congressperson in violation of 18 U.S.C. § 115(a)(1)(B). 22-cr-00119-MAC-ZJH-1 (EDTX) DE:10. Casey made numerous and repeated threats of death to his opponent in an election for U.S. House. (multiple threats and § 115(a)(1)(B) case)

6) In 2022, **Neil Walter** was charged in the Eastern District of Michigan with violating 18 U.S.C. § 875(c) for leaving a phone message for a U.S. Congressman, saying he was going to die. Weeks later, Walter posted comments on the internet with a video threatening to kill the Director of the FBI. Walter also owned a gun. 22-mj-30506-CI-1 (EDMI). (multiple threats case).

7) In 2022, **Charles Germany** was charged in the Middle District of Louisiana with the interstate transmission of threats to a U.S. Congressperson in violation of 18 U.S.C. § 875(c). 22-CR-00042-JWD-SDJ (MDLA) DE:1. Germany is alleged to have threatened to kill the Congressperson in one voicemail, and threatened violence in a second voicemail. https://www.justice.gov/usao-mdla/pr/walker-man-faces-federal-charges-connection-interstate-transmission-threat-injure (last accessed July 5, 2023). (multiple threats case).

8) In 2022, **Justin Kuchta**, was charged in the District of Maryland, for making threats to murder a member of Congress in violation of 18 U.S.C. § 875(c). Kuchta made threats through a district office in Texas in July of 2022

using an event management website. Kuchta stated that he used the event planning website — meant to coordinate an event in Missouri that the Congressperson was attending — to send an email threatening the lives of featured guests, including that member of Congress. Kuchta in an email, explicitly stated his intent to murder the member. Kuchta was sentenced to 4-months incarceration. 23-CR-00014-RDB (DMD) (DE:20). (multiple threats).

Similarly, there have been a smattering of cases in 2023 that have involved threats against members of Congress that have been prosecuted:

1) In 2023, **Brian Gaherty** was charged with four counts of violating § 875(c) and four counts of violating § 115(a)(1)(B) for telling a Congressperson's staff member that he was going to assault the congresswoman. He also left at least four threatening voicemails, including a threat to "cut your black (expletive) throat." Gaherty called again in November, 2022, and spoke to a staff member, and said, "Tell Congresswoman Maxine Waters when I see her on the street I'm going to bust her upside her head." During the investigation, it was revealed that Gaherty "has a history of sending racist, violent threats to other congresswomen." In addition to his threats targeting Congresswoman Waters, Gaherty he had also called and left threatening voicemails with two other congresswomen. Gahetry left 10 voicemails for another congresswoman threatening to assault her. The case remains pending for trial. 23-CR-00184-RGK-1 (CDCA). (multiple threats and § 115(a)(1)(B))

2) In 2023, **Allan Poller** has been charged in the District of New Hampshire for violating 18 U.S.C. § 115(a)(1)(B) and 18 U.S.C. § 875(c) for leaving a voicemail for a U.S. Congressperson which stated: "Hi, my name is Allan Poller, A-L-L-A-N P-O-L-L-E-R, phone number []8931. And I just want to let you know, Representative [Name], if you keep on coming for the gays, we're gonna strike back and I guarantee you, you do not want to fuck with us. We will kill you if that's what it takes. I will take a bullet to your fucking head if you fuck with my rights anymore. And then if you want to keep going down that path, you know who's next." 23-cr-00039-LM (DNH), DE:1. That case remains pending for trial. (18 U.S.C. § 115(a)(1)(B) case).

3) In 2023, **Robert Vargo** was convicted of violating 18 U.S.C. § 871, 875 and 115(a)(1)(B) for mailing threatening communications to a U.S. Congressman, the President and a United States District Judge, threatening to kill them and their families. The threats were directed at the Congressman's role on the January 6th committee, and Vargo "also invoked the name of domestic terrorist Timothy McVeigh, who bombed the Oklahoma City federal building in 1995." https://www.justice.gov/usao-mdpa/pr/columbia-county-man-sentenced-threatening-president-

congressman-bennie-thompson-and (last accessed June 29, 2023). (multiple threats case).

4) In 2023, **Aaron Thompson** was arrested and charged in Indiana for misdemeanor assault for multiple threatening calls to a Congressman, for calling the "office and [leaving] threatening messages on a number of occasions. Thompson made one of these calls on April 6 and seven on April 11 ….'Mole-ay, MOle-ay, Mole-ay, Mole-ay…Hope you die,' Thompson said in one voicemail, 'yay Mole-ay three daughters. Hey hey hey three bullets hey hey hey one wife yay. Oh yeah, yeah, we'll give her two bullets. Mole-ay how's your moles on face you little f—khead? I hope you f—king get your brains blown out,' ….'Here's the choice. Your daughters grow up without their dad. Or you grow old without your daughters,' ….emphasizing to [the Congressman] that he owned a gun. 'How you like that? Let me know what your opinion is. I'll make the decision. Love you f—king f–got.'" https://www.dailysignal.com/2023/06/06/boom-boom-you-pick-authorities-arrest-man-who-threatened-gop-congressman-young-daughters/ (last accessed June 29, 2023). (uncharged in federal court).

5) In 2023, **Michael Kennedy** was charged in Colorado state court with threatening a U.S. Congressman, for "repeatedly leaving voicemail messages for the Democratic congressman in which he threatened to shoot Neguse over his advocacy for stricter gun laws. The messages were peppered with racist language and insinuations against Neguse, who is Black. The arrest warrant lists 17 separate voicemails left between mid-May and late June last year, many of them referencing past mass shootings, including those at the Table Mesa King Soopers, which was in Neguse's district, and the Buffalo Tops grocery, in which the shooter specifically targeted Black people….'Check this out, Joe Neguse,' Kennedy allegedly said in one message. 'What are you going to do about me? I got me a AK-47 pointed directly at you. What are you gonna (expletive) do about that?' https://www.cpr.org/2023/04/12/denver-man-arrested-threatening-joe-neguse/ (last accessed June 29, 2023). (not charged in federal court).

There have been a smattering of other reported cases since 2010:

1) In 2019, **Darryl Albert Varnum** was charged in the District of Maryland with three counts of violating § 875(c) for repeatedly calling a Congressperson's Florida office, threatening to come down to Miami and kill her if the bill were introduced. "I'm gonna kill your ass if you do that bill. I swear. I will f---ing come down and kill your f---ing ass. And you're a congressperson, that's fine. I hope the f---ing FBI, CIA and everybody else hears this s---," Varnum was recorded as saying on the Congressperson's voicemail according to the complaint. "This is the United States of America, bitch. Get the f--- out... I'll tell you what I'll come down to Miami

bitch. I'll f--- you up. Like Cubans don't even know." According to the warrant, only 12 minutes after making the threat, Varnum posted a picture of the American flag on his Facebook page with the words "H.R. 2527 Vaccinate All Children Act of 2019." Then, the warrant says, he wrote, "Holocaust has begun! I'm done with this bulls---. Time to step up or ship out!" https://www.miamiherald.com/news/politics-government/article232838447.html#storylink=cpy. 19-CR-00337-RDB-1 (D.MD). Varnum was sentenced to 6-months of home detention for his conduct after admitting he was drunk when he left some messages. https://www.washingtonpost.com/health/man-avoids-prison-for-threatening-vaccine-bill-supporter/2020/07/07/100c881c-c092-11ea-8908-68a2b9eae9e0_story.html (last accessed July 5, 2023). (multiple threats case)

2) In 2010, **Norman LeBoon**, pleaded guilty to threatening a Congressman and transmitting in interstate commerce a threatening communication in violation of 18 U.S.C. § 875(c) and 115(a)(1)(B). 10-CR-00696-JP. Leboon produced a YouTube video over the Internet, containing a threat to kill a Congressman. https://www.justice.gov/archive/usao/pae/News/2010/Oct/leboon,n_release.pdf. According to an affidavit in support of the warrant for LeBoon's arrest issued on March 28, 2010, LeBoon transmitted a video over the Internet on YouTube, in which he stated: "My Congressman Eric Cantor, and you and your cupcake evil wife..." "Remember Eric...our judgment time, the final Yom Kippur has been given. You are a liar, you're a Lucifer, you're a pig, a greedy f------ pig, you're an abomination, you receive my bullets in your office, remember they will be placed in your heads. You and your children are Lucifer's abominations." Following his arrest, LeBoon told federal agents that Eric Cantor is "pure evil"; "will be dead"; and that "Cantor's family is suffering because of his father's wrath." https://archives.fbi.gov/archives/philadelphia/press-releases/2011/ph040711.htm (last accessed July 5, 2023). (mass media threat).

3) In 2018, **Carlos Bayon** was convicted by a jury of two counts of interstate communication of a threat and two counts of assault on a Congressperson in violation of 18 U.S.C. § 875(c) and 115(a)(1)(B) after leaving a voicemail for a Congressperson which stated: "hey listen, this message is for you and the people that sent you there. You are taking ours, we are taking yours. Anytime, anywhere. We know where they are. We are not going to feed them sandwiches, we are going to feed them lead. Make no mistake you will pay. Ojo por ojo, diente por diente (Spanish for "an eye for an eye, a tooth for a tooth). That is our law and we are the majority. Have a good day." On the same day, the Washington State office of another United States Congressman received a threatening voicemail with the same message. Both calls were traced to Bayon. https://www.justice.gov/usao-

wdny/pr/grand-island-man-arrested-leaving-threatening-voicemails-two-us-congressmen (last accessed July 5, 2023). 18-CR-00163-FPG-JJM (WDNY). He was sentenced to 60-months imprisonment. (multiple threats case).

4) In 2021, **Kenneth Gaspe**r was charged in New York state court for a telephoned death threat against a Congressperson over a vote that Gasper "did not agree with." Gasper called a district office, cursed at the staff member who answered, and called the Congressman a RINO, an insult that stands for "Republican in name only," according to the criminal complaint. Gasper warned that if he saw the Congressman on the street he would kill him. Gasper, was charged with aggravated second-degree harassment. https://www.fox5ny.com/news/long-island-man-arrested-for-threatening-congressman-garbarino (last accessed July 5, 2023). (not prosecuted in federal court).

5) In 2021, **Robert Lemke** was charged in the Southern District of New York with violating 18 U.S.C. §875(c) after he sent a series of threats to a New York Congressman's brother during the January 6 attack on the Capitol. One of the threats included a photo of a home in the brother's neighborhood, while another stated, "Your brother is putting your entire family at risk with his lies and other words. We are armed and nearby your house," Lemke allegedly said in the text to Jeffries' brother. "You had better have a word with him. We are not far from his either. Already spoke to [Congressman-1's son] and know where his kids are." https://www.nbcnews.com/news/us-news/california-man-charged-making-threats-against-family-congressman-journalist-n1255693 (last accessed July 5, 2023). 21-CR-00100-AKH-1 (SDNY). (multiple threats case).

These are the cases that can be found via available search engines. Critically, of these cases, **only the Defendant** and Allan Poller, (charged in the District of New Hampshire with leaving a threatening voicemail for a member of Congress due to the Congressperson's alleged anti-gay agenda), appear to be charged **for a single alleged threat with a violation of 18 U.S.C. § 875(c)**.[5] The Defendant appears to be the **only person** to have been prosecuted for a single phone call to a congressperson, with only an § 875(c) charge.

---

[5] Though Poller is also charged with a violation of 18 U.S.C. § 115(a)(1)(B). 23-cr-00039-LM (DNH), DE:1. The Defendant in this case is not charged with violating § 115(a)(1)(B), which carries only a 1-year maximum possible punishment.

This is the most available information related to prosecutions for alleged threats to members of Congress. However, some additional data can be gleaned from the Department of Justice. Due to the increased number of threats being made towards all public officials after the 2020 election, the Department of Justice established a Task Force aimed at addressing threats to **election officials** in 2021. While the task force was directed towards the collection of data related to election officials (not Congress), the results would still reveal threats aimed at public officials, and therefore can also be compared with the U.S.S.C. data that has been collected because such cases would also likely use the same Sentencing Guideline Section as cases of threats to Congress.

The Department of Justice Election Threats Task Force "indicated that, out of the over 1,000 cases reviewed, only 11% met the threshold for prosecution, and less than 5% provided the information needed to launch an investigation." https://bridgingdivides.princeton.edu/sites/g/files/toruqf246/files/documents/Threats%20and%20Harassment%20Report.pdf (last accessed June 29, 2023).[6] As such, this data also provides few prosecutions (4) that would result in the use of U.S.S.G. § 2A6.1.

An additional resource for determining the number of threats directed at public officials (such as members of Congress) stems from the 2022, "Princeton University

---

[6] Despite indicating "over 1000 cases," of threats, the task force announced it had prosecuted four cases. https://www.reuters.com/legal/government/us-justice-dept-sued-disclose-records-threats-election-workers-2022-08-25/ (last accessed June 29, 2023).

Bridging Divides Initiative." This project created a new "Threats and Harassment Dataset (THD), [to] evaluate… tens of thousands of news sources with a targeted LexisNexis search string and combined data from partners such as Anti-Defamation League (ADL), Armed Conflict Location & Event Data Project (ACLED), National League of Cities, Brennan Center and Prosecution Project."https://www.washingtonpost.com/politics/2022/11/09/elected-officials-threats-attacks. (last accessed June 29, 2023).

The Princeton initiative defines "'threats' as instances in which one person communicates to another an intention to inflict pain, injury, damage or other hostile action." Id. They also included "both criminal and noncriminal incidents of threat and harassment." Id. The Princeton initiative "data collection effort identified 400 incidents of threats and harassment against local officials between January 1, 2020 and September 23, 2022." https://bridgingdivides.princeton.edu/sites/g/files/toruqf246/files/documents/Threats%20and%20Harassment%20Report.pdf (last accessed June 29, 2023). This data set included non-elections based threats: "40% were related to elections, 30% related to education (30%), and 29% related to health issues (overwhelmingly COVID-19 issues)." https://bridgingdivides.princeton.edu/THD-overview (last accessed June 29, 2023). Of the 400 cases identified "[j]ust over half of 400 cases considered consisted of harassment, with approximately a third consisting of threats. The remaining 10% of cases involved both threats and harassment." Id. Table 1 from the study identified 190 threat based cases against officials over a 2-year period. Table 2 indicates that

the targets of the threats are: election officials and poll workers (139); School officials (123); elected or appointed government officials (84); health officials (47); and, other (7). Id. Figure 8 in the study reveals the nature of the threats and harassment used in the cases found in the study:



Figure 8: Nature of Threat or Harassment

Id.

Princeton identified 190 threats against public officials cases in a 2-year period (2020-21).[7] USCP TAS investigated a total of 18,238 threats against Congress

---

[7] The data is available for a combined time frame from January 1, 2020, to September 23, 2022 (the dates used by the Princeton project). This date range does not fit perfectly with the USCP TAS and USSC Guideline data (which uses full years), but it comes within 3-months of 2022 of doing so.

members in the years 2020 and 2021. U.S.S.G. § 2A6.1 was used in a total (to include non-public official cases) of 432 cases in 2020 and 2021. It is clear that the vast majority of USCP TAS threats against Congressional members investigations and claims are **not** resulting in communicated threat prosecutions, like the one against the Defendant in this case.

There are a multitude of publicized cases involving alleged threats to members of Congress that have resulted in *no prosecution*. In January, 2023, Congressman Eric Swalwell received a private message from a man in Indiana named Jonathan Reeser. Part of the message reported by the media read:

> I HOPE YOU FAMILY IS RAPED AND MURDERED AND I HOPE YOU GET TIED TO THE BACK OF A TRUCK AND DRUG 10,000 MILES UNTIL YOU BODY IS RIPPED TO PIECES YOU SCUM. I WISH I SAW YOU IN PERSON ID BREAK YOUR (explicit) FACE SO FAST YOUD HAVE PLASTIC SURGERY AND NEVER LOOK THE SAME AGAIN.

https://www.indystar.com/story/news/politics/2023/01/14/indiana-man-threatens-u-s-rep-eric-swalwell-loses-job/69809292007/. (last accessed June 28, 2023)(all caps in original). Reeser was never arrested or charged for the message that was sent. Similarly, Congressman Adam Kinzinger, stated that a threat was mailed to his house this year which threatened to execute him, his wife, and their child. The threat was reportedly sent from the local area. https://thehill.com/homenews/3529964-kinzinger-shares-threat-to-family/ (last accessed July 5, 2023). Nobody was arrested or charged (though it is not clear if the sender was ever identified or not). In 2017, Congressman Al Green's call for the impeachment of President Donald Trump resulted in voicemails loaded with death threats and racial slurs, such as, "Hey, Al

Green. We got an impeachment for you. It's going to be yours. Actually going to give you a short trial before we hang your *** ***," one man said in a recording. In another, a man's voice says, "You ain't going to impeach nobody, you ***. Try it and we'll lynch all you *** ***. You'll be hanging from a tree." https://www.wfaa.com/article/news/congressman-al-green-threatened-with-lynching-after-calling-for-impeachment/287-441833091 (last accessed July 5, 2023). It is not clear if those leaving the messages were identified or not.

In a June, 2017 article in the "Washington Free Beacon," author Alex Griswold indicated that a "total of 30 Republican members of Congress" had "either been attacked or revealed that they were the victim of a death threat since the beginning of May [2017]." https://freebeacon.com/issues/30-gop-congressmen-attacked-threatened-since-may/ (last accessed July 5, 2023). Griswold indicated that only four persons were arrested and charged in relation to the threats and/or violence included in the article. The arrests were for: stalking; multiple communicated threats to a member of Congress; threats to multiple persons in Congress; and attempted murder.

Also never arrested was Colorado Congressman Ken Buck, who posted a video to Twitter challenging former US Representative Beto O'Rourke and former vice president Joe Biden to come to his office and take his AR-15, which he was holding in the video. The video stated: "I have a message for Joe Biden and Beto O'Rourke, if you want to take everyone's AR-15s in America, why don't you swing by my office in Washington, D.C. and start with this one, Come and take it." https://www.cnbc.com/2020/03/06/rep-ken-buck-dares-joe-biden-and-beto-orourke-to-

take-ar-15-rifle.html (last accessed June 30, 2023). Buck has not been arrested or charged. Florida (state) representative Randy Fine wrote to the President on Twitter, ""I have news for the embarrassment that claims to be our President — try to take our guns and you'll learn why the Second Amendment was written in the first place." Fine was never arrested or charged. On December 21, 2020, then Congressman-elect Madison Cawthorn told a rally to call their Congresspersons to "lightly threaten" their members of Congress and tell them "everybody is coming after you." https://www.scribd.com/document/491732014/Cawthorn-Complaint# (last accessed July 5, 2023). Cawthorn was never arrested or charged.

In May of this year, Congressman Swalwell was reportedly threatened by Bruce Miller via private message, which read: "'Almost time!!! Would you rather Guantanamo or just execution f—kin traitor,'" along with three cry-laughing emoji." Miller engaged in further dialogue with Congressman Swalwell, following up that, "that punishment is in the cards for you and many others!" https://www.sfgate.com/49ers/article/49ers-bruce-miller-swalwell-threat-18106503.php (last accessed June 29, 2023). Miller has not been arrested or charged for the threats. In November, 2021, Congressman Paul Gosar, of Arizona, was censured by the U.S. House of Representatives for posting on his social media account an anime "character with Gosar's image wielding a sword to kill a character with the image of [Democratic Congressperson Alexandria] Ocasio-Cortez," of New York, who has been the subject of intense hate by many members of the Republican party nationally.        https://www.npr.org/2021/11/17/1056397130/rep-gosar-faces-censure-

over-an-anime-video-of-himself-killing-aoc (last accessed June 29, 2023). Gosar was not charged with any crime, despite Congressperson Steny Hoyer noting that "the video could qualify as a criminal offense since making threats against federal officials is illegal." Id. In 2016, a Bernie Sanders Supporter in Nevada attempted to publish an obituary for Hillary Clinton, the former First Lady of the United States, and Senator from New York, who was the Democratic nominee for President in 2016. The attempt generated a visit from the United States Secret Service, but no criminal charges against the man (Hillary Clinton is still alive and apparently well). https://www.washingtonpost.com/news/post-politics/wp/2016/02/20/apparent-sanders-backer-is-reported-to-secret-service-for-submitting-clinton-obituary-to-newspaper/ (last accessed June 29, 2023). In April, 2021, NBA superstar LeBron James "tweeted" and later deleted "a photo of [police] officer Nicholas Reardon, with an accompanying caption, "YOU'RE NEXT #ACCOUNTABILITY," along with an hourglass emoji," following the officer's fatal shooting of a black female. https://www.espn.com/nba/story/_/id/31306343/lebron-james-explains-why-deleted-tweet-police-shooting-makhia-bryant (last accessed June 29, 2023). James was never charged with any crime for the post. In October, 2021, at a public meeting for a political action committee, TPUSA, an attendee in Idaho inquired of the TPUSA speaker when they could begin using guns against Democrats, and indicated that he was not joking. https://www.mediamatters.org/charlie-kirk/pushing-election-lies-tpusa-audience-member-asks-charlie-kirk-when-they-can-use-guns (last accessed June 29, 2023). The man was never arrested or charged for the threat against

Democrats. Similarly, in May, 2023, the governor of South Carolina, speaking to a convention, stated, "I look forward to the day that Democrats are so rare, we have to hunt them with dogs…. Christale Spain, chairwoman of the South Carolina Democratic Party, decried [the governor's] comments as 'absolutely chilling' to hear." Spain noted that, "[t]he majority of the Dem electorate in SC is Black and our governor is saying out loud he can't wait to hunt us down with dogs." Spain, also noted the well-known history of South Carolina, where dogs were used against black slaves, and that the Governor's statement was an obvious "dog whistle" advocating political and race based violence. https://www.nbcnews.com/politics/politics-news/democrats-blasted-gov-mcmaster-remark-hunting-dogs-rcna85744. (last accessed June 29, 2023). Despite calls by Spain and others for law enforcement action based on the threatening comment, no charges or arrests were made. It is clear that exceptionally few threats cases are the subject of prosecutions, and the Defendant appears to be the only case of a single alleged threat charged under only 18 U.S.C. § 875(c).

It is clear that there are a multitude of similar cases that have never been prosecuted by the Justice Department. Even when another case was prosecuted, it included a misdemeanor offense. The Defendant is the only person who has called Congress a single time who has been prosecuted for a felony offense only.

### III) *THE DEFENDANT IS BEING IMPERMISSIBLY PROSECUTED FOR THE EXERCISE OF CONSTITUTIONALLY PROTECTED POLITICAL HYPERBOLE:*

### 1) *Political Speech is entitled to First Amendment protection:*

"Political speech" is entitled to special protection pursuant to the First Amendment to the United States Constitution. *See Snyder v. Phelps*, 562 U.S. 443, 451, 458 (2011). The Defendant's message qualified as constitutionally protected "political hyperbole" intended to communicate his strongly held views. *See e.g. Watts v. United States,* 394 U.S. 705, 708 (1969).

The Defendant's voicemail message was not intended as a threat, but rather constitutionally protected "political hyperbole" intended to communicate his strongly held views. *See Watts v. United States*, 394 U.S. 705, 708 (1969). Moreover, the Defendant's message does not constitute the severity of speech excepted from First Amendment protection under the "true threats" doctrine. *See Virginia v. Black,* 538 U.S. 343, 359 (2003) ("'True threats' encompass those statements where the speaker means to communicate a *serious* expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.")(emphasis added)(internal citations omitted)).

### 2) *"Political speech" includes raw and/or abhorrent speech:*

Unfortunately, the rawest political and issue-related passions are often accompanied by abhorrent speech. This reality was recognized in *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), where the Supreme Court ruled that we, as a nation, hold a deep-rooted commitment "to the principle that debate on public issues should be uninhibited, robust, and wideopen." Courts must "be eternally vigilant against [government] attempts to check the expression" of disfavored political views.

*Abrams v. United States,* 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). The United States protects the virtually unfettered right of persons and organizations to make "vehement, caustic, and .. . unpleasantly sharp" political statements. *Horsley v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2002), *quoting Sullivan*, 376 U.S. at 273). Chief Justice Roberts articulated this principle in *Snyder v. Phelps*, where the Court held that an inflammatory protest by the Westboro Baptist Church at a soldier's funeral service was protected under the First Amendment:

> [S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection . . . . Given that Westboro's speech was at a public place on a matter of public concern, that speech is entitled to special protection.

562 U.S. 443, 451, 458 (2011). The speech that the Supreme Court determined was protected in that case included: that at the soldiers' funerals, the church carried signs that read "God Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the USA," "Thank God for IEDs," "Thank God for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "God Hates Fags," "You're Going to Hell," and "God Hates You." *Id*. at 448. While abhorrent and caustic, the speech by the Westboro Baptist Church admittedly did not indicate or include speech related to violence towards the viewers or listeners (nor was it seemingly political in nature). Yet, there are a multitude of examples of speech that includes angry and/or violent rhetoric towards public officials that did *not* result in any criminal charges being sought by prosecutorial agencies. The national discourse has often included speech referring to violent and/or angry conduct without any resulting criminal charges.

In *Watts v. United States*, 394 U.S. 705, 708 (1969), the Court held that an anti-draft activist's threat to kill President Johnson was protected under the First Amendment. Watts had been convicted for telling protestors on the National Mall that "[i]f [the government] ever make[s] me carry a rifle the first man I want to get in my sights is L.B.J. They are not going to make me kill my black brothers." *Id*. at 706 (internal quotations omitted). The Court found that Watts' statement – while threatening – was "political hyperbole," and explained:

> [W]e must interpret the language Congress chose against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen . . . . We agree with petitioner that his only offense here was a kind of very crude offensive method of stating a political opposition to the President. Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise.

*Id.,* at 708 (internal quotations omitted).

Similarly, no person who spoke at the political rally on January 6, 2021, which preceded an "attack" against the capital by the assembled crowd has been charged with any crime related to their speech.[8] Prior to the attack, President Trump's speech to the rally attendees included the line: "[w]e fight like hell. And if you don't fight like hell, you're not going to have a country anymore," but also included the line, "I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard."

---

[8] The term "attack" is not hyperbole in this pleading, as it is the term used by the government in virtually all of the pleadings in January 6th cases to describe the actions of the crowd that took place that day. See e.g. https://www.justice.gov/usao-dc/case-multi-defendant/file/1469276/download (last accessed June 29, 2023).

https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial (last accessed June 29, 2023). Congressman Mo Brooks of Alabama spoke at the rally, stating, "[t]oday is the day American patriots start taking down names and kicking ass….Are you willing to do what it takes to fight for America? Louder! Will you fight for America?" https://www.al.com/news/2021/01/mo-brooks-today-patriots-start-kicking-ass-in-fighting-vote-results.html (last accessed June 29, 2023). Ali Alexander, a key organizer of the January 6th rally, "has continued to publish violent rhetoric since the riots. …. in a new Internet video, he vowed: 'We are going to punish the traitors,' referring to Republican politicians who endorsed Biden's electoral victory. 'The Lord says vengeance is his, and I pray I am the tool to stab these motherf---ers.'" https://www.reuters.com/article/us-usa-trump-protest-organizers-insight/how-trumps-pied-pipers-rallied-a-faithful-mob-to-the-capitol-idUSKBN29G2UP (last accessed June 29, 2023). Alexander has not been charged with a crime. At the conclusion of the rally, the crowd marched to, and illegally entered the Capital, with the intention of disrupting the business of certifying the results of the election.

The Defendant, like all other in the United States, has the virtually unfettered right to make "vehement, caustic, and .. . unpleasantly sharp" political statements. *Horsley v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2002), *quoting New York Times Co. v. Sullivan,* 376 U.S. 254, 273 (1964). The content of the Defendant's message plainly relates to matters of public import- namely, the cause of gay-rights, and the debate with those who view gay-rights and cause as activities of child-predatory "groomers."

### 3) *The alleged victim in this case is the frequent subject of "passionate," raw, and abhorrent political speech:*

Much like President Johnson during the Vietnam War, or Congress, after the election of 2020, Representative Santos has engendered raw emotions and passions by a number of minority groups. The Defendant's comments towards Santos were a politically angry and caustic challenge related to the Congressman's widely reported views and positions. Santos has been at the forefront of political intrigue (to put it mildly) and reporting since his election to the House of Representatives from New York in 2022. To state that the Congressman has engendered "strong political feelings" in people would be a Herculean understatement of monumental proportion. Some of the highlights that have caused the most passionate backlash against the Congressman:

1) On January 5, 2023, Congressman Santos appeared to display a well-known white power hand signal while voting on the House floor. https://www.vanityfair.com/news/2023/01/did-rep-george-santos-flash-the-white-power-symbol-in-the-house-chamber (last accessed June 26, 2023). The white power movement has traditionally been an anti-gay-rights group.

2) On January 31, 2023, Congressman Santos appeared on the House floor prominently wearing a lapel pin of an AR15 assault-style rifle. Weeks later, he joined an effort to make the AR15 rifle, the "National Gun of the United States," engendering outrage from those who have been victims of firearm violence, and those seeking to end firearm based violence. https://www.salon.com/2023/02/24/unforgivable-insult-george-santos-wants-to-make-ar-15-the-national-of-america/ (last accessed June 26, 2023). Gay-rights-activists have often been associated with the anti-assault rifle movement in Florida after the massacre at the "Pulse" gay nightclub in Orlando, Florida.

3) On January 21, 2023, it was widely reported (and headline news) that, after running for office as an openly gay Republican candidate, the Congressperson joined colleagues in supporting what has commonly been

referred to as the state of Florida's "Don't say gay bill" (Florida House Bill 1557). Representative Santos expressed on his widely viewed "Facebook" page that: "The Left is hellbent on creating a false narrative because they want to groom our kids ... As a gay man, I UNAPOLOGETICALLY support this law!" The Congressmen was widely reported to have joined with members of his party that targeted the "drag-queen" community, and pushed anti-gay/lesbian/bisexual/trans/queer legislation. This was despite news that the Congressperson had appeared in "drag" previously in Brazil. https://abcnews.go.com/US/santos-lauded-floridas-dont-gay-bill-denies-claims/story?id=96534392 (last accessed June 27, 2023). Santos openly associated the gay-rights movements with child-predator-"groomers."

4) On December 19, 2022, "The New York Times published a bombshell investigation questioning whether Santos fabricated much of his biography, including his education, work history and financial dealings. The report, along with Santos' eventual admission of "embellishing" his résumé, led to calls for his resignation from Democratic lawmakers and at least one Republican, with federal, state and local authorities announcing they were investigating or "looking into" the congressman-elect." https://www.nbcnews.com/nbc-out/out-politics-and-policy/george-santos-arrived-dc-week-no-one-riled-nys-gay-congressman-rcna64294 (last accessed June 27, 2023). On January 9, 2023, "[g]roups including the Campaign Legal Center and End Citizens United [accused] Santos of financial mismanagement, with the former filing a complaint with the F.E.C. on January 9, alleging campaign funds were illegally spent on personal expenses and expenditures were falsified." https://www.teenvogue.com/story/george-santos-explained-whats-next (last accessed June 28, 2023). It appears that some of these falsities and "embellishments" later led to the federal indictment of Representative Santos by the Justice Department. See: https://www.justice.gov/usao-edny/pr/congressman-george-santos-charged-fraud-money-laundering-theft-public-funds-and-false (last accessed June 29, 2023).

5) On January 4, 2023, it was reported that "several biographical claims Santos made on the campaign trail" had subsequently been called into question as lies included "that his grandparents were Ukrainian Jewish refugees who fled the Holocaust." https://www.nbcnews.com/nbc-out/out-politics-and-policy/george-santos-arrived-dc-week-no-one-riled-nys-gay-congressman-rcna64294 (last accessed June 27, 2023).

Thus, by the time of the alleged conduct charged in this indictment, Representative Santos had stirred the "raw passions" (to put it mildly) of a host of historically victimized minorities including: persons of Jewish faith, those who are

against white supremacy, supporters of gay/lesbian/bisexual/trans/queer communities, and those who are active in the effort to end gun violence, as well as individuals and groups opposed to government corruption and campaign finance violations.

4) **_Prosecutions of actual politically based violence and/or trespassing based upon activism related to alleged theft of an election have been treated less severely than activism and mere speech related to gay rights:_**

As stated by the Defendant in his post arrest statement, the Defendant is deeply offended by what he views as Santos' anti-gay agenda, and the harm he has done to the cause of gay-rights. This is a cause that the Defendant is active in and passionate about (and has been so since his HIV diagnosis). As such, the Defendant's activist passions were stirred. Yet, his actions were only to speak out, and included no actual violence, or any steps towards violence (as would be required under an "assault" based statute). Once more, the prosecution has not treated all activist speech of a political nature similarly.

On January 6, 2021, a political rally in support of President Trump in Washington, DC, turned into the violent and illegal entry into the United States Capital while Congress was in session within, conducting business related to the election of President Biden. The offenses committed were allegedly related to the activists' protest of what they viewed as a stolen election. To date, 1,049 people have been charged federally with offenses related to this entry and disruption of Congress' official business. https://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-

arrested-and-their-stories (last accessed June 29, 2023). 553 of these persons have been sentenced by federal courts. Id. The median sentence for those who have received prison time has been 90-days. Id. These cases, the charges, the plea bargains, and the conduct involved are the most revealing of the selective prosecution in this case (all following information stems from three sources, and are provided as a synopsis of the cases from those sources and are not exhaustive of the cases filed or the information available about them, to wit: https://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-arrested-and-their-stories; https://www.justice.gov/usao-dc/defendants; and the included links within the Justice Department website. ):

1) *United States v. Paul Edward Kovacik*: 1:22-mj-100 Paul Kovacik breached the U.S. Capitol on Jan. 6, 2021, through the Senate wing doors and filmed several YouTube videos over the course of the roughly 25 minutes that he remained in the building. Prosecutors say they further confirmed Kovacik's presence in the building through surveillance camera footage and police body-worn camera footage…..Kovacik pleaded Guilty to one charge: Parading, Demonstrating, or Picketing in a Capitol Building. The other charges are dismissed. Sentenced to 90 Days of incarceration; 3 Years of Probation; Special Assessment of $10; Restitution of $500. Kovacik has prior criminal contacts and had recent criminal contact with the Mequon (Wisconsin) Police Department.

2) *United States v. Brian McGhee:* 1:23-mj-33 Brian McGee entered the Capitol. Court documents state that during a conversation with the FBI over the phone, McGee said that he saw police officers waving rioters inside and fist-bumping them. An FBI review of surveillance footage does not back this up. McGee pleaded Guilty to one charge: Parading, Demonstrating, or Picketing in a Capitol Building. Sentencing set for 10/13/2023.

3) *United States v. Melody Steele-Smith,* 21-cr-00077 Her conduct included posting on Facebook- "I'm trying to figure out how I could be there all day and miss all this violence and destruction I'm seeing on TV,"… "I think photos for the news were staged." One of the photos Steele-Smith took appeared to show her inside House Speaker Nancy Pelosi's office. Under the caption, "Nancy's Office," there is a collage of images -- a framed photo of Pelosi hanging on a wall, a coin rack on top of a cabinet and in one, in a

partial reflection, what looked to be a white fuzzy headband and light hair that investigators said was consistent with selfies that Steele-Smith took of herself on Jan. 6. ... According to a court document, Steele-Smith served in the Navy and was honorably discharged in 1999. She plead guilty to Count Two of the Indictment, charging Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1), which carries a maximum sentence of one (1) year of imprisonment. She was sentenced to 36 months Probation with 90 days home detention; $500 Restitution; and $25 Special Assessment.

4)  *United States v. William Vogel,* 1:21-cr-56 An FBI tipster claimed William Vogel was "very vocal" about being at the rally in Washington, D.C.. Court documents indicate Vogel was identified as a rioter after law enforcement received videos he shot and narrated while he was inside the Capitol building. ...In Snapchat videos, Vogel can be seen walking around the Capitol building while law enforcement is seen retreating from the rioters. ...Vogel's Facebook account, ... was used to send photos that showed him participating in the riot. He also shared a video taken from the top of the west front steps of the Capitol building. Vogel pleaded Guilty to one charge: Parading, Demonstrating, or Picketing in a Capitol Building. The other charges were dismissed. Sentenced to 30 days of incarceration; 36 Months of Probation; a Special Assessment of $10.

5)  *United States v. Timothy Wayne Williams,* 21-mj-454 Williams was present in the Capitol Crypt and was observed to take a selfie ..., and at approximately 14:18:47 a fire extinguisher is thrown by an unknown individual standing near Williams. He was seen joining in chants with the crowd towards law enforcement officers. Williams pleaded Guilty to two charges: Entering and Remaining in a Restricted Building or Grounds and Theft of Government Property. The other charges were dismissed. Sentenced to 6 Months of Incarceration;12 months of supervised release with 6 months of home confinement; Special Assessment $50; Restitution of $500.

6)  *United States v. Rasha N. Abual-Ragheb,* 1:21-cr-43 Abual-Ragheb admitted to entering the U.S. Capital on January 6th. A Facebook page for Abual-Ragheb in November 2020 showed her participating in Facebook and Telegram group chats with members of the New Jersey chapter of the American Patriot 3%, a far-right anti-government militia movement. In one of those chats, a user whom the FBI believes was Abual-Ragheb said that a civil war was coming and that people needed to show support and rise up and fight for the Constitution. During an FBI interview, Abual-Ragheb allegedly told agents she was born in Lebanon and fled to Jordan when she was a child to escape the civil war there. She told agents she had been in the U.S. for 21 years and was a Trump supporter, attended his rallies and was blocked from Facebook and Twitter for some of her pro-Trump postings. Abual-Ragheb pleaded Guilty to one charge: Parading, Demonstrating, or

Picketing in a Capitol Building. Sentenced to 36 months probation, the first 2 months as Home Detention; 60 hours community service; $10 assessment; $500 restitution.

7) *United States v. Chase Kevin Allen,* 1:22-cr-361 Allen pleaded Guilty to the charge of committing an act of physical violence on capital grounds. A tipster provided a photo from a Facebook page called "The Allen Report" where Allen can be seen wearing a white Boston Red Sox beanie and a camouflage backpack. Law enforcement recognized that outfit from YouTube videos of a previously unidentified young man stomping on and smashing media equipment outside the Capitol. In one of those videos, Allen can allegedly be heard yelling multiple times: "Get the f*** out of here" after a journalist repeatedly said, "We are leaving." In a May interview with law enforcement, Allen said he runs a YouTube channel called "The Allen Report" and "considers himself to be a documentary filmmaker" who travels across the country to film events. Allen said that he did not enter the Capitol and that he did not destroy any media equipment. He also said that he "sometimes does things while filming among groups like those at the U.S. Capitol to fit in and cause those around him to believe that he is one of them." He told police the worst thing he did was "use foul language." Sentenced to 3 years of probation; 14 days of intermittent confinement; 50 hours of community service; $500 restitution; $10 special assessment.

8) *United States v. Michael Jerrett Amos,* DC Court, Michael Amos was arrested for breach of the U.S. Capitol on Jan. 6, 2021. D.C. Superior Court documents show Amos was charged with unlawful entry. Amos pleaded not guilty. Amos successfully completed a diversion program and his case was dismissed on January 25, 2022.

9) *United States v. Neil Ashcraft,* 1:22-cr-295 Neil Ashcraft pleaded guilty to stealing an American flag and flagpole from the U.S. Capitol on Jan. 6, 2021, and taking them to his home in Florida. A fellow rioter later burned the flag at Ashcraft's mother's house and tossed the pole into a pond in an attempt to conceal the evidence. Ashcraft admitted he scaled scaffolding outside and "exhorted other rioters to storm the Capitol" before the crowd broke windows to access the building, according to the filing. He was among the first rioters to enter the Senate wing, carrying a white metal pole inside and striking the floor repeatedly, according to the filing. Ashcraft also posed for a photo with a statue of former President Ronald Reagan inside the Rotunda before stealing the flag from a room or hallway near the Rotunda and wrapping it around his shoulders. According to the filing, Ashcraft left the Capitol after about 40 minutes inside. In a sentencing memorandum filed in federal court, prosecutors identified Ashcraft as a former U.S. Marine and said his military experience made his knowledge of the flag burning unexpected, saying that Ashcraft would have instead been expected to hold the flag "sacrosanct." Ashcraft pleaded Guilty to both

charges. Sentenced to 80 days incarceration; 36 months supervised release; $50 special assessment.

10) *United States v. Ryan Keith Ashlock,* 1:21-cr-160 According to court records, videos from the Jan. 6, 2021, riot show several people who the FBI has assessed as members of the far-right group Proud Boys marching toward the Capitol. Videos show Ryan Keith Ashlock marching with this group. In one video, the same group, led by Proud Boys organizers Joseph Biggs and Ethan Nordean, is seen marching toward the entrance of the Capitol, according to the affidavit. Images from the riot and FBI statements link Ashlock to the Kansas City Proud Boys. He can be seen wearing a green tactical vest with orange tape affixed to the front, a gray respirator, yellow goggles and gray kneepads. According to the FBI, U.S. Capitol Police footage also shows Ashlock and several confirmed Proud Boys members trying to pass the barricades and officers guarding the Capitol entrance. Individuals are not only seen moving together but also gesturing to one another while moving together on the Capitol grounds, said the FBI. As the group tried to enter the building, Ashlock allegedly pushed on the barricades and law enforcement but got repelled by officers when they used pepper spray. Ashlock pleaded Guilty to one charge: Entering and Remaining in a Restricted Building or Grounds. The other charges were dismissed. Sentenced to 70 days of Incarceration followed by 12 months of Supervised Release; 100 hours of community service; $25 Special Assessment and Restitution of $500.

11) *United States v. Stephen Michael Ayres,* 1:21-cr-156 Stephen Ayres and two unidentified friends filmed a video in their hotel room to "share what really happened" at the Capitol building and posted it on YouTube following the riot. According to an FBI affidavit, at some point during the video, Ayres' male friend claimed that "Antifa breached" the Capitol and that police "escorted" them into the building. He stated it was a "staged Antifa setup" coordinated by media, police and the mayor of Washington, D.C. In response, Ayers agreed that the entire incident was "definitely planned out." Court documents also cite a witness who contacted the authorities after allegedly watching a livestream Ayers broadcasted from his Facebook account. According to the witness, Ayers was acting "like he was at war." The witness also said that at some point during the streaming video, Ayres stated that the incident at the Capitol was "just the beginning" and that there was "more to come next week." Ayres pleaded Guilty to one charge: Disorderly and Disruptive Conduct in a Restricted Building or Grounds. The other charges were dismissed. Sentenced to 24 months of probation, $500 restitution; $25 special assessment; 100 hours community service.

12) *United States v. Stephen Maury Baker,* 1:21-cr-273 Stephen Baker recorded live footage under the alias "Stephen Ignoramus" during the protests at the Capitol. Once inside, Baker is allegedly heard on tape saying: "All right, what's up, y'all? How you guys doin'? Super-intense. Welcome, I am

Stephen. I'm a livestreamer and a musician. We're having fun, huh? Repent and believe in Jesus." Baker also makes multiple references to members from the far-right groups The Red Elephants and Oath Keepers, identifying some of them by name, during his livestream. Baker is also seen on video saying, "I was inside for like an hour, dude. I was one of like the last 10 people in there. ... this s*** is history." A witness who was interviewed by the FBI stated that they've known Baker for about 10 years and were alarmed by the content of those videos, which included, according to the witness, the "advancement of conspiracy theories and mockery of minority groups." Baker pleaded Guilty to one charge: Parading, Demonstrating, or Picketing in a Capitol Building. The other charges were dismissed. Sentenced to 24 months probation; 9 days intermittent incarceration; $500 restitution; $10 special assessment.

13) *United States v. Tyler Bensch,* 22-mj-184, Bensch is a member of a Florida right-wing militia group called the "B- Squad." He "wore a tactical vest, as well as a military-style helmet with goggles and a black gas mask," along with "a chemical irritant in front of the vest," the Justice Department said. While other members of the "B Squad" allegedly pushed on the police line guarding the tunnel on the west side of the Capitol, Bensch "remained just outside." After police successfully repelled the group, Bensch "used one of his chemical irritants to spray the face of an individual who was an unknown member of the crowd, even though that person posed no threat to him," the Justice Department stated. He was permitted to plead guilty to two misdemeanor counts and was sentenced to 2-years of probation.

The government noted in the filings in these cases (and virtually all others) that Congress and the Vice President were actually present in the Capital and were engaged in government proceedings at the time all the individuals in question entered the capital. Thus, all of these individuals were committing their criminal conduct in Washington, with congresspersons and the Vice president present and nearby. See. e.g. https://www.justice.gov/usao-dc/case-multi-defendant/file/1511641/download (last accessed June 29, 2023).

Title 18 U.S.C. § 1752(a) can be punished as a felony with up to ten (10)-years imprisonment if a weapon is possessed during the trespass on restricted grounds, or bodily injury results, or as a misdemeanor with a maximum penalty of one-year of

incarceration if not. 18 U.S.C. § 1752(b)(1) and (2). The intent of the entry into the restricted federal grounds does not alter the punishment in § 1752(b)(1) and (2). Other charges *are* concerned with the intent behind the trespass, such as 18 U.S.C. § 1512(c)(2), and 40 U.S.C. § 5104(e)(2). The majority of the individuals arrested and charged in relation to January 6th have been permitted by the government to enter pleas to Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(G), which is a misdemeanor. See e.g. *United States v. Robert Ballesteros,* Case No. l;21-mj-00132. By contrast, this Defendant is being prosecuted merely for speech, for a felony offense with a five-year maximum possible penalty. Thus, the government is charging this Defendant with a far more serious felony based merely on speech that stemmed from a gay-rights activists' positon, than many individuals who actually attacked the Congress.

The government is *not* prosecuting thousands of cases (according to the TAS data) related to threats to Congress. [9] This includes a number of individuals previously described herein, who are known to law enforcement (such as Jonathan Reeser and Bruce Miller). Others who have "threatened" members of Congress have been charged or permitted to plead guilty to misdemeanor violations of 18 U.S.C. § 115(a)(1)(B), which results in a one-year maximum permissible sentence (in assault based cases) rather than a five-year sentence for a violation of 18 U.S.C. § 875(c) (such

---

[9] The Secret Service was also alleged to be aware of more than 12,000 threats on Twitter to assassinate President Trump in 2017, with few apparent arrests. https://mashable.com/article/threatening-posts-secret-service (last accessed July 5, 2023).

as David Hannon, Chase McNeill, Douglas Casey, and Brian Gaherty).
https://www.law.cornell.edu/uscode/text/18/115 (last accessed July 5, 2023). Only two
cases involving gay-rights-activists have been identified within this subset of "threats
against Congress" cases: the Defendant and Allan Poller, 23-cr-00039-LM (DNH),
DE:1. These are apparently the only two cases involving a single communication to a
member of Congress charged under 18 U.S.C. § 875(c), and Poller is also charged via
§ 115(a)(1)(B), permitting the possibility of a misdemeanor outcome. As such, the
prosecution in this case is unusual in the extreme and is impermissibly related to
Constitutionally protected speech. The Defendant is being prosecuted more severely
than individuals who the government claims actually "attacked" congress.

WHEREFORE, the Defendant moves this Court to find that this prosecution
is unusual, in that the overwhelming majority of others with similar conduct have
not been prosecuted for this conduct, and in such cases have only been prosecuted for
multiple communications, or pursuant to a less-significant misdemeanor statute, and
that this prosecution is based upon the exercise of a Constitutional right to free
speech, and dismiss this case.

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

By:     s/ *Jan C. Smith, II*
        Assistant Federal Public Defender
        Florida Bar No. 0117341
        One East Broward Boulevard, Suite 1100
        Fort Lauderdale, Florida 33301-1842
        Tel: 954-356-7436

Fax: 954-356-7556
E-Mail: Jan_Smith@fd.org

## CERTIFICATE OF SERVICE

I HEREBY certify that on July 10, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:    s/   *Jan C. Smith, II* AFPD

36